# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

# AUSTIN DIVISION

| | | |
|---|---|---|
| MARKUS A. GREEN,<br>    Petitioner,<br><br>V.<br><br>NATHANIEL QUARTERMAN,<br>Director, Texas Dept. of Criminal Justice-<br>Correctional Institutions<br>Division,<br>    Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | A-07-CA-898-LY |
| MARKUS A. GREEN,<br>    Petitioner,<br><br>V.<br><br>NATHANIEL QUARTERMAN,<br>Director, Texas Dept. of Criminal Justice-<br>Correctional Institutions<br>Division,<br>    Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | A-07-CA-899-LY |
| MARKUS A. GREEN,<br>    Petitioner,<br><br>V.<br><br>NATHANIEL QUARTERMAN,<br>Director, Texas Dept. of Criminal Justice-<br>Correctional Institutions<br>Division,<br>    Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | A-07-CA-900-LY |

| | |
|---|---|
| **MARKUS A. GREEN,** § | |
| Petitioner, § | |
| § | |
| **V.** § | **A-07-CA-901-LY** |
| § | |
| **NATHANIEL QUARTERMAN,** § | |
| Director, Texas Dept. of Criminal Justice- § | |
| Correctional Institutions § | |
| Division, § | |
| Respondent. § | |

## CONSOLIDATED REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

To:   The Honorable Lee Yeakel, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's four applications for habeas corpus relief brought under 28 U.S.C. § 2254. Petitioner has paid the filing fee for three of his applications. For the reasons set forth below, the undersigned finds that Petitioner's applications for writ of habeas corpus should be dismissed.

### I.  STATEMENT OF THE CASE

**A.    Petitioner's Criminal History**

According to Petitioner, he was convicted of unauthorized use of a motor vehicle on July 20, 1990. As a result, he was sentenced to 10 years in prison. Court personnel have confirmed with the records department of the Texas Department of Criminal Justice - Correctional Institutions Division that Petitioner discharged this sentenced in 2002.

2

Petitioner also asserts he was convicted of practicing medicine without a license and causing psychological harm on July 8, 2002. As a result, he was sentenced to 40 years in prison. Petitioner's conviction was affirmed by the Third Court of Appeals of Texas on May 27, 2004. His motion for rehearing was overruled on June 24, 2004, and his petition for discretionary review was refused on December 15, 2004. Petitioner did not file a petition for writ of certiorari.

Petitioner, with the assistance of counsel Engin Derkunt, filed a federal application for habeas corpus relief. It was dismissed on May 11, 2006, because Petitioner had not exhausted his state court remedies. Petitioner subsequently returned to state court again with the assistance of Derkunt and filed a state application for habeas corpus relief. The application was dismissed on August 9, 2006, as it failed to comply with state procedures. According to Petitioner, he filed his own state application for habeas corpus relief on May 25, 2007. The Texas Court of Criminal Appeals denied it on October 10, 2007.

**B.      Factual Background**

The factual background of this case is found in the Court of Appeals opinion and is repeated below.

> The complaining witness in this case is A.W., a nineteen-year-old woman. A.W. testified that on July 9, 2001, a man named "Darrell" called her and told her that she had a sexually transmitted disease (STD) and that she needed to come to a health clinic to be tested.FN3  She was told by the person on the phone that she could die from an STD if she were not immediately treated. A.W. made an appointment with "Darrell," and she and her then-boyfriend, W.G., went to the "Austin Complement Health Clinic" (the "clinic") FN4 in the Shoal Creek Medical Building, a professional medical office building. The clinic contained a waiting room with a table and magazines, chairs upholstered in what appeared to be black leather, end tables, lamps, and a flowering plant. A framed, poster-sized, dental-health advisory advertisement hung on one of the walls, and the floor was carpeted in a plain gray color.

FN3. A.W. could not remember whether "Darrell" told her the name of the clinic over the telephone. However, she testified that he gave her an address and that the clinic she went to was the same as the clinic to which "Darrell" told her to go. W.G., A.W.'s former boyfriend, identified this person as "Dwayne."

FN4. The name of the clinic was labeled on a plaque outside of the clinic door.

After A.W. and W.G.'s arrival, appellant appeared wearing a white lab coat and introduced himself to both A.W. and W.G. as "Dr. Markus Green." FN5  A.W. had never seen appellant before and had no idea how he obtained her contact information.

FN5. She acknowledged that appellant never showed her anything specifically identifying appellant as an "M.D."

Appellant assisted A.W. to complete a standard medical-history form and informed her that she had syphilis. He did not discuss with her how she had contracted the disease or on what basis he formed his conclusion. He then led A.W. to an examination room,FN6 which contained tall white cabinets, a small sink and counter with several different types of surgical supplies on top of the counter, several curtained areas, a rolling doctor's stool, a tall lamp, and an examination table. The table was equipped with stirrups, medical wax paper, and utility drawers. On the wall, a sign identified appellant as "Doctor Markus Green." Appellant asked A.W. to disrobe and provided her with a cotton robe. Because she had never been given a full gynecological examination, A.W. did not know what to expect.

FN6. W.G. remained in the waiting room.

Appellant then measured A.W.'s blood pressure. Once A.W. was on the table, appellant pulled open her robe. He used the wooden end of a cotton swab to poke at A.W.'s nipples, examining them for "excess discharge." He did not check her breasts for lumps. Next, he inserted a plastic speculum into her vagina and widened it, to the point of causing her pain. Appellant told A.W. that she had a mild yeast infection that needed to be broken up. He inserted a vibrator into her vagina and operated it for about three minutes. He then told her that everything else was okay. He did not conduct any tests on A.W., nor did he prepare vaginal slides or ask for a urine sample. He gave her Monistat 7 to treat her "infection." After the examination, A.W. felt awkward and vomited in the bathroom.

After her visit to appellant's clinic, A.W. contacted the Austin Police Department, where she received counseling from a crime victim's counselor. As a result of her encounter with appellant, she said she regularly experienced periods of shortness of breath, headaches, and tingling and numbness in her fingers and body. She also

testified that after her experience, she has felt less trusting of people and has had trouble communicating her feelings to others.

W.G. also testified.FN7 He repeated the details of the circumstances that led up to A.W.'s appointment with appellant. Appellant would not allow him in the examination room with A.W. From the waiting room, he heard a humming noise, and a few minutes later he heard A.W. vomit. He then went to the examination room and found her "balled up" on the floor and crying. Appellant then spoke with W.G. about STDs and asked him for a urine sample. Appellant tested W.G.'s urine with a test strip and told him that he tested negative for any kind of STD. He then gave W.G. vitamin B6 and other "antibacterial pills." FN8  W.G. then went into the bathroom, where A.W. was again vomiting. Appellant also entered the bathroom, and in order to reassure A.W. and W.G. that the clinic was really a doctor's office he illuminated the room with a blacklight to demonstrate that there was bacteria and blood on the walls.

FN7. W.G. and A.W. ended their romantic relationship at some point after these events.

FN8. W.G. could not remember what these other "antibacterial pills" were. He consumed those pills while at the clinic, and he testified that he "blacked out" briefly on his way home after the appointment.

Before A.W. and W.G. left the clinic, appellant told them a cost for the office visit and exam and quoted an additional $45 for the Monistat 7. Because they did not have money with them, appellant said he would mail them a bill. Finally, W.G. testified that following these events A.W. has had emotional problems: "She would start hyperventilating and crying real bad and she'd turn a bright, bright red, and she would just cry for [a] half hour to an hour at a time. Just hyperventilating and crying."

The jury also heard the testimony of A.W.'s mother, R.W. After the incident, A.W. described her experience to her mother. R.W. attempted on her own to determine whether appellant was a licensed physician. She called appellant's office to request an appointment for an STD exam. Later that evening, she received a phone call from appellant, who identified himself as "Dr. Markus Green." A.W.'s mother asked appellant about his qualifications, and appellant confirmed he was a doctor. He also told her that there were other doctors at the clinic.

Van Nguyen, who worked as an office temporary in the clinic, testified in court. She was placed by her agency at the clinic and worked for appellant for three days in July 2001. When he contacted her for employment, he identified himself as "Dr. Green."

He wore a white lab coat and described himself as a "general doctor" who did massages and treated patients with STDs.

An officer from the Texas Board of Medical Examiners testified that appellant was not licensed to practice medicine in this state. A medical-supply store clerk testified that appellant, who identified himself as a doctor and dressed in a lab coat and stethoscope, attempted to purchase medical supplies from the store. A team of officers from the Austin Police Department investigated this case. They found medical supplies, including a hand-held blacklight, a bag of disposable plastic speculums, cotton-tip applicators, urinalysis strips, books on infectious diseases and gynecology, a receipt book, checks in the name of "Dr. Markus Green," and a box for a "Flex-a-Pleasure" vibrator. They also found a framed certificate from the Massachusetts Medical Society.

Beth Nauert, a licensed physician who has conducted gynecological exams and treated women for STDs, testified as an expert witness for the State. FN9 She explained the proper procedure for conducting a gynecological exam. Such an exam includes taking a woman's vital signs, examining her breasts for lumps, and examining the genital area for indications of cancer or other diseases. A breast exam consists of examining the entire breast for lumps. Testing for syphilis requires a blood test, and not a breast or a gynecological exam. To make an immediate diagnosis of syphilis, one would need at least fifteen minutes and have access to a laboratory to spin blood drawn from the patient. Furthermore, doctors test for a yeast infection by examining a discharge under a microscope. The physician testified that she had never heard of using a vibrator to break up a discharge as a form of diagnosis or treatment for a yeast infection or an STD, nor is it common practice to use a vibrator during a gynecological exam.

FN9. She typically introduces herself as "doctor" and not as a licensed physician.

Appellant testified in his own defense. FN10 He was certified by Travis County to do business as "Austin Complement Health Clinic." However, he is not a professional in any field in Texas in which he could call himself a doctor. He planned to make money by screening patients for STDs, referring them to a research facility, and receiving commissions from the facilities for placing the individual. He emphasized that he was screening, rather than diagnosing, patients. Appellant further testified that he purchased medical supplies and a roll-around stool "that doctors sit on," and set up an office.

FN10. Appellant also offered the testimony of several other witnesses. However, their testimony is not relevant to the issues presented on appeal.

6

>He selected A.W. because he suspected she had "crabs." FN11  During a physical examination, appellant testified that he removed one "crab."  He admitted that he inserted the speculum into A.W.'s vagina.  He stated that she was "tense" and that he used the vibrator in her vagina as "vibration therapy" to relax her muscles.  He claimed to have taken a vaginal swab and to have looked at the swab under the microscope for "clue cells."  He also decided to conduct a "urinalysis" on W.G. and advised him to see a urologist.
>
>FN11. By "crabs," appellant was apparently referring to crab lice, sucking lice of the classification Phthirus pubis that infest the human body in the pubic region.  See Webster's Third New International Dictionary 527 (1986).  Again, appellant did not indicate on what information he based his conclusion.
>
>Finally, the record contains almost eighty exhibits, including photographs of the clinic and of equipment used by appellant, notes made about clients of the clinic, lists made by appellant of supplies to buy, and certificates and mail addressed to "Doctor Marcus Green" or "Dr. Marcus Green," among other items.

Green v. State, 137 S.W.3d 356, 359-62 (Tex. App.– Austin 2004, pet. ref'd).

**C.     Petitioner's Grounds for Relief**

In Cause No. 07-CV-898-LY Petitioner challenges his conviction for unauthorized use of a motor vehicle for which he was sentenced to 10 years in prison.  According to Petitioner, he was on parole when he was arrested for more than one count of sexual assault, which charges were later dismissed.  During his detention, a blue warrant was issued.  Petitioner asserts this blocked his ability to make bail and suspended the accumulation of street time credit.  Petitioner complains the Parole Board waited until Petitioner was convicted of a new and different offense, presumably practicing medicine without a license, to revoke his parole.

In Cause No. A-07-CV-899-LY Petitioner challenges his conviction for practicing medicine without a license and causing psychological harm.  He argues his conviction is unconstitutional, because the statute fails to define what constitutes a finding of psychological harm.  Petitioner explains a finding of psychological harm raises the offense of practicing medicine without a licence

from a misdemeanor to a felony. He further argues his conviction was obtained pursuant to the imposition of an unlawful sentence because his sentence was unlawfully enhanced by prior convictions. Petitioner also argues the evidence was insufficient to support a finding that Petitioner "publicly professed" to be a physician or surgeon, that his conviction was obtained pursuant to an unlawful arrest, that his conviction was obtained pursuant to an illegal search and seizure, and that his indictment was obtained under false pretenses. In his final ground for relief Petitioner argues his DNA was unlawfully collected in February 2007, while he was serving his 40-year sentence.[1]

In Cause No. A-07-CV-900-LY Petitioner challenges his conviction for practicing medicine without a license and causing psychological harm. He argues the appellate court: (1) failed to properly address his claim that the State was required to prove he "pretended" to conduct an exam; (2) erred in holding the jury could infer that Petitioner "publicly professed" to being a physician; and (3) erred in not addressing Petitioner's fifth point of error that the trial court erred in telling jurors they could infer that he "publicly professed" to be a physician.

In Cause No. A-07-CV-901-LY Petitioner challenges his conviction for practicing medicine without a license and causing psychological harm. Similar to the claims raised in Cause Nos. A-07-CV-899-LY and A-07-CV-900-LY, Petitioner argues the evidence is legally insufficient to sustain the jury's implied finding that Petitioner was "pretending" to conduct an exam. Petitioner explains, contrary to the charge in the indictment, the State clearly established that Petitioner actually conducted the exam. Petitioner also argues the evidence is legally insufficient to sustain the jury's implied finding that Petitioner "publicly professed" to be a physician or surgeon and the jury's

---

[1] Petitioner's claim regarding the collection of DNA evidence is not properly presented in his application for habeas corpus relief, as it is not a challenge to his holding conviction.

finding that Petitioner had directly or indirectly charged the victims for any services. Petitioner further argues the evidence was factually insufficient to support his conviction. In his final ground for relief Petitioner argues the trial court erred by sustaining the State's objection to defense counsel's closing argument where counsel proclaimed that "publicly professing" could not be "inferred."

## II.   DISCUSSION AND ANALYSIS

**A.   Jurisdiction**

Federal habeas corpus relief is available only for persons who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3), 2254(a). A habeas petitioner is not "in custody" under a conviction when the sentence imposed for that conviction has fully expired at the time the petition is filed. Maleng v. Cook, 490 U.S. 488, 491, 109 S. Ct. 1923, 1925 (1989). At the time he filed his federal application, Petitioner had discharged his 10-year sentence for the unauthorized use of a motor vehicle in Cause No. 88-7-13,248. Therefore, he cannot bring a federal habeas petition directed solely at that charge. Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 401 (2001) ("Coss is no longer serving the sentences imposed pursuant to his 1986 convictions, and therefore cannot bring a federal habeas petition directed solely at those convictions").

Although Petitioner was not in custody pursuant to his conviction in Cause No. 88-7-13,248, he was in custody pursuant to his conviction in Cause No. 9014200. A petitioner meets the jurisdictional "in custody" requirement if the habeas petition could be construed as asserting a challenge to the sentence presently being served as enhanced by the prior conviction, for which the petitioner is no longer in custody. Williams v. Dretke, No. 05-20303, 2006 WL 707135 at *1 (5th

Cir. Mar. 21, 2006) (citing Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 401-02 (2001)). " '[I]n custody' does not necessarily mean 'in custody for the offense being attacked.' Instead, jurisdiction exists if there is a positive, demonstrable relationship between the prior conviction and the petitioner's present incarceration." Id. (quoting Sinclair v. Blackburn, 599 F.2d 673, 676 (5th Cir. 1979)).

Petitioner challenges the revocation of his parole in Cause No. 88-7-13,248. Petitioner's challenge of his parole revocation is not construed as a challenge to his holding conviction. Because Petitioner fully discharged his sentence in Cause No. 88-7-13,248 before he filed his federal application, the Court is without jurisdiction to consider Petitioner's application filed in Cause No. A-07-CV-898-LY.[2]

**B.     Statute of Limitations**

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"].[3] The AEDPA amended 28 U.S.C. § 2244 to provide a statute of limitations for applications for habeas corpus relief filed pursuant to 28 U.S.C. § 2254. That section provides, in relevant part:

> (d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[2] Even if this Court had jurisdiction over Petitioner's application, challenging his conviction for unauthorized use of a motor vehicle, his application is time-barred as explained below.

[3] Pub.L. No. 104-132, 110 Stat. 1214 (1996).

10

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Petitioner's conviction in Cause No. 9014200 for practicing medicine without a license and causing psychological harm became final, at the latest, on March 15, 2005, at the conclusion of time during which he could have filed a petition for writ of certiorari with the United States Supreme Court. See SUP. CT. R. 13.1 ("A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review."). The revocation of Petitioner's parole for the offense of unauthorized use of a motor vehicle in Cause No. 88-7-13,248 occurred prior to his conviction becoming final in Cause No. 9014200. Accordingly, the latest Petitioner could have timely filed his federal applications for federal habeas corpus relief was March 15, 2006. Petitioner appears to have placed his applications in the prison mailing system on or about October 22, 2007, long after the limitations period had expired.

Petitioner's first federal application, which was dismissed for failure to exhaust state court remedies, did not operate to toll the limitations period. Duncan v. Walker, 533 U.S. 167, 121 S. Ct. 2121 (2001) (an application for federal habeas corpus review is not an "application for State post-

conviction or other collateral review" and does not toll the limitation period during the pendency of the federal application). Petitioner's state applications also did not toll the limitations period. Both applications were filed after the limitations period had expired. Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000) (where a state habeas application is not filed until after the limitations period has run, pursuant to § 2244(d)(2), filing does not toll the limitations period). In addition, the first application was not properly filed, as it was dismissed for non-compliance. An application for state post-conviction relief is "properly filed" for purposes of 28 U.S.C. § 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable [state] laws and rules governing filings." Artuz v. Bennett, 531 U.S. 4, 8, 121 S. Ct. 361, 364 (2000). See also Villegas v. Johnson, 184 F.3d 467, 470 (5th Cir. 1999) (state habeas application "properly filed" when it conforms with state's applicable procedural filing requirements such as those governing time and place of filing).

The record does not reflect that any unconstitutional state action impeded Petitioner from filing for federal habeas corpus relief prior to the end of the limitations period. Furthermore, Petitioner has not shown that he did not know the factual predicate of his claims earlier. Finally, the claims do not concern a constitutional right recognized by the Supreme Court within the last year and made retroactive to cases on collateral review.

### III. RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus filed in Cause No. A-07-CV-898-LY be dismissed without prejudice for lack of jurisdiction, and in the alternative be dismissed with prejudice as time-barred. It is further recommended that Petitioner's claim regarding the taking of DNA evidence be dismissed without prejudice as that claim is not properly filed in Cause No. A-07-CV-899-LY, an application for habeas corpus relief. It is finally

recommended that Petitioner's applications for writ of habeas corpus filed in Cause Nos. A-07-CV-899-LY, A-07-CV-900-LY and A-07-CV-901-LY be dismissed with prejudice as time-barred.

## IV.  OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See 28 U.S.C. § 636(b)(1)(C);  Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985);  Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 31st day of October, 2007.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

13